UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JAMES E. MYCOFF,

                          Petitioner,

vs.                                    Case No.  2:08-cv-664-FtM-29DNF

STATE OF FLORIDA and FLORIDA
ATTORNEY GENERAL,

                          Respondents.

_____


## OPINION AND ORDER

Petitioner James E. MyCoff[1] initiated this action by filing a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on August 26, 2008,[2] challenging his state court judgment of conviction entered in the Twentieth Judicial Circuit in Lee County Florida (case number 97-2799-CF) for manslaughter and robbery with a weapon on June 11, 1999. Petition at 1.  The Petition sets forth the following grounds for relief.

Ground 1

Trial Court erred by denying Petitioner's motion for judgment of acquittal on the robbery count because there was insufficient evidence.

_____

[1]Petitioner will be referred to as "Petitioner," "Mycoff," or "Defendant."

[2]The Petition (Doc. #1) was filed in this Court on August 28, 2008.  The Court, however, applies the "mailbox rule" and deems the Petition "filed on the date it was delivered to prison authorities for mailing." Alexander v. Sec'y Dep't of Corr., 523 F.3d 1291, 1294 n.4 (11th Cir. 2008).

## Ground 2

Trial court erred by not including in the jury instruction the "after thought" defense to the robbery.

## Ground 3

Trial Court erred by limiting cross-examination of a key State witness, improper impeachment by allowing the State to ask Petitioner about working with defense counsel, and improperly limited Petitioner's testimony to not allow him to testify about specifics of his prior convictions.

## Ground 4

Ineffective assistance of appellate counsel on direct appeal for failing to file a reply brief, failing to timely move for rehearing, for failing to distinguish certain State cases, and for failing to raise the federal dimension of grounds 1, 2, and 3 above.

## Ground 5

Trial court erred by admitting Petitioner's pre-trial statements given to police in violation of <u>Miranda</u>.

## Ground 6

Petitioner's conviction violates double jeopardy because he was convicted of two counts of manslaughter when there was only one victim.

## Ground 7

Petitioner's conviction is unconstitutional based on newly discovered evidence concerning a biased juror who tainted the jury.

## Ground 8

Petitioner's conviction is unconstitutional because he is "actually innocent."

## Ground 9

Trial court erred by not making a proper finding under Fla. Stat. § 775.084 (5) dealing with habitualization.

<u>See</u> Petition. Respondent filed a Response (Doc. #9) in opposition to the Petition on June 23, 2009, and filed exhibits (Doc. #10, Exhs. 1-14) consisting of some of the trial court and post-conviction records. Petitioner filed a Reply (Doc. #19, Reply) on October 9, 2009. The Court directed Respondent to file a supplemental Response because, <u>inter alia</u>, the Response contained sparse citations to the record. Respondent filed a supplement response (Doc. #21, Response) on August 15, 2011. Petitioner then filed an "Amended Reply" (Doc. #22) on August 26, 2011.[3]

This Court has carefully reviewed the record and, for the reasons set forth below, concludes no evidentiary proceedings are required in this Court. <u>Schriro v. Landrigan</u>, 550 U.S. 465, 127 S. Ct. 1933, 1939-40 (2007). Petitioner does not proffer any evidence that would require an evidentiary hearing, <u>Chandler v. McDonough</u>, 471 F.3d 1360 (11th Cir. 2006), and the Court finds that the pertinent facts of the case are fully developed in the record before the Court. <u>Schriro</u>, 550 U.S. at 474; <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003), <u>cert. denied</u>, 541 U.S. 1034 (2004). This matter is ripe for review.

## I. Procedural History

### A. Charges and Trial

Petitioner was charged with first-degree premeditated murder (count I), first-degree felony murder (count II), and robbery with

---

[3]Petitioner's Amended Reply refers to his Reply, in large part.

a deadly weapon (count III).  Petitioner proceeded to a jury trial on April 12 through April 16, 1999. On April 16, 1999, the jury found Petitioner guilty of the lesser-included offenses of manslaughter (count I) and robbery (count III).  Exh. 14, Vol. III at 1458; Exh. 14, Vol. XI at 1582 (docket sheet).  The trial court merged counts one and two, and on June 11, 1999, sentenced Petitioner to thirty-years in prison as a habitual felony offender on count one and a concurrent thirty-year sentence on count three. Exh. 14, Vol. I at 4-5; Exh. 14, Vol. XI at 1586.  Petitioner, through counsel, moved for a new trial. Exh. 14, Vol II at 61-64. The trial court denied the motion for new trial.  Id. at 65.

## B.  Direct Appeal and Relevant Post-Conviction Motions

### 1.  Direct Appeal

Petitioner, through counsel, filed a direct appeal raising the following five claims:

> (1) Trial court erred in limiting cross examination of State witness, Jeff Charron;
>
> (2) Trial court erred in permitting improper impeachment of Defendant;
>
> (3) Trial court erred in denying motion to suppress Defendant's pre-trial statements given to police after Defendant invoked his right to counsel;
>
> (4) Trial court erred in denying Defendant's motion for judgment of acquittal on the robbery charge; and,
>
> (5) Trial court erred in denying Defendant's requested jury instruction on the issue of "after thought" as to the robbery charge.

Exh. 14, Vol. II at 156. The State filed a brief in response. Exh. 2. Petitioner, through counsel, filed a supplemental brief raising another ground of trial court error:

(6) Trial court erred in refusing to permit Defendant to testify about the nature of his prior convictions.

Exh. 3. The State filed a supplemental answer brief. Exh. 4. On July 28, 2000, the appellate court *per curiam* affirmed the trial court's decisions and mandate issued thereafter. Exh. 5, Exh. 6.

**2. Rule 3.800 Motion**

Petitioner, proceeding *pro se*, filed a Rule 3.800 Motion claiming his sentence as a habitual felony offender violated "fundamental due process of the 14th Amendment, due to invalid statute § 775.084 [sic] in violation of <u>Apprendi v. New Jersey</u>, 120 S. Ct. 2348 (2000)."[4] Exh. 14, Vol. II at 83-94; Petition at 3; *see also* Exh. 14, Vol. I at 12-13 (subsequent post-conviction motion discussing prior motions). The post-conviction court denied Petitioner relief on November 29, 2000. Exh. 14, Vol. II at 95-97; Petition at 3. Petitioner appealed the adverse decision and the appellate court affirmed the post-conviction court's decision on

---

[4]In the Response, Respondent neither cites to a copy of the Rule 3.800 Motion, nor a copy of the post-conviction court's order denying Petitioner relief. <u>See</u> Response at 3 (improperly referring to the Motion as Rule "3.850" Motion). The Court independently located a copy of Petitioner's Rule 3.800 Motion and the order denying the Motion, which was attached to Respondent's Exhibit 14, Vol. II at 83, and Exhibit 14, Vol. II at 83-94.

January 31, 2001.  Response at 3; Petition at 3; <u>Mycoff v. State</u>,
791 So. 2d 472 (Fla. 2d DCA 2001)[table].

### 3.  First Rule 3.850 Motion

Petitioner, proceeding *pro se*, filed his first Rule 3.850
Motion on April 2, 2001, raising fifteen grounds for relief.[5]  Exh.
14, Vol. II at 98-108 (copy of Rule 3.850 Motion); Petition at 3;
Response at 3.  On April 9, 2001, the post-conviction court denied
Petitioner relief on all claims.  Exh. 14, Vol. II at 109-116 (copy
of order denying Rule 3.850 motion); <u>see</u> <u>also</u> Petition at 5-12;
Exh. 12, Appx. C (copy of post-conviction court's order of denial).
Petitioner appealed the adverse decision, and the appellate court
*per curiam* affirmed the post-conviction court's decision on April
30, 2003.  Petition at 4; <u>Mycoff v. State</u>, 853 So. 2d 420 (Fla. 2d
DCA 2003)[table].

---

[5]Respondent states that he does not submit a copy of
Petitioner's Rule 3.850 Motion because "no copy is available."
Response at 3.  Respondent points out, however, that the Rule 3.850
Motion is referred to in the 2007 State's answer brief to
Petitioner's appeal of the denial of Petitioner's subsequent Rule
3.850 Motion attached as Respondent's Exhibit 7.  <u>See</u> Response at
3.  The Court independently located a copy of these documents in
Respondent's exhibits.  <u>See</u> Exh. 12, Appx. C (order of denial),
Exh. 14, Vol. II at 98-108 (motion).

**4.  State Petition for Writ of Habeas Corpus[6]**

On December 29, 2002, Petitioner filed a state petition for writ of habeas corpus alleging ineffective assistance of appellate counsel.[7]  Petition at 13; see also Exh. 14, Vol. I at 13 (referencing prior post-conviction motions).  The appellate court summarily dismissed the petition on February 24, 2003.  Id.

**5.  Second Rule 3.850 Motion**

Petitioner, proceeding *pro se*, filed a second Rule 3.850 Motion on September 3, 2003, raising, *inter alia*, claims of newly discovered evidence.  Exh. 14, Vol. I at 12-21 (post-conviction motion); Petition at 14; Response at 4 (citing Exh. 7).  The State filed a response pursuant to the post-conviction court's orders. Exh. 14, Vol. II at 50-53. The post-conviction court summarily dismissed grounds 1(c), 1(d) and 4, and noted that grounds 2 and 3 were identical to ground 1 and did not warrant separate consideration.  Exh. 14, Vol. VIII at 1458. The post-conviction court appointed Petitioner counsel, and directed an evidentiary

---

[6]According to the Petition, on December 29, 2002, Petitioner filed his first "state habeas corpus petition" to request permission to proceed with a belated appeal of the post-conviction court's denial of his Rule 3.850 Motion.  Petition at 4. Petitioner states the appellate court granted the petition and accepted the appeal as timely filed on December 30, 2002.  Id.

[7]In the Petition, Petitioner references this state habeas corpus petition.  Respondent does not suggest, nor produce, any evidence showing that Petitioner did not file a state habeas corpus petition. The Court could not locate a copy of the state petition in the record.

hearing on his newly discovered evidence claims raised in grounds 1(a), 1(b), and 1(e). Exh. 11 (evidentiary hearing).

On August 24, 2004, the post-conviction court held an evidentiary hearing at which Patricia and Joseph Battaglia testified. Exh. 14, Vol. VIII at 1488. Upon the conclusion of the evidentiary hearing, on July 27, 2005, the post-conviction court entered an order denying Petitioner relief on all claims. Exh. 14, Vol. VIII at 1458-1464 (order). Petitioner moved for rehearing. Exh. 14, Vol. IX at 1532. On August 22, 2005, the post-conviction court denied Petitioner's motion for rehearing. Exh. 14, Vol IX at 1543.

Petitioner appealed the post-conviction court's denial concerning Petitioner's newly discovered evidence claim, summary denial of grounds 2 and 3, and ground 4. Exh. 12. The State filed an answer brief in response. See Exh. 7. The appellate court apparently _per curiam_ affirmed.

###    6.    Second Rule 3.800 Motion

On August 30, 2006, Petitioner filed another Rule 3.800(a) motion to correct an illegal sentence on the basis that the State failed to prove that Petitioner had two separate felony convictions required to qualify Petitioner as a habitual felony offender. Petition at 16-17. The State filed a response. Id. at 16. On May 25, 2007, the post-conviction court entered an order denying Petitioner's Rule 3.800(a) Motion, citing to all of the

Petitioner's prior felony convictions.  <u>Id.</u> at 16-17.  Petitioner appealed the adverse ruling and the appellate court *per curiam* affirmed on May 21, 2008.  Petition at 19.

### 7.  Third Rule 3.850 Motion

On July 9, 2008, Petitioner filed a third Rule 3.850 alleging that his conviction violated Double Jeopardy because he was convicted of two counts of manslaughter.  Petition at 21.  By order entered July 21, 2008, the post-conviction court denied Petitioner relief finding the Motion was untimely under two-year time limitation set forth in Fla. R. Crim. P. 3.850(b) and successive because Petitioner raised the identical claim in his April 2, 2001 Rule 3.850 Motion.  <u>Id.</u> at 21-22.

## II.  Applicable § 2254 Law

On August 26, 2008, Petitioner filed the instant federal Petition.  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), governs this action.  <u>Abdul-Kabir v. Quarterman</u>, 550 U.S. 233, 246 (2007); <u>Penry v. Johnson</u>, 532 U.S. 782, 792 (2001). Under AEDPA, the standard of review is greatly circumscribed and highly deferential to the state courts.  <u>Alston v. Fla. Dep't of Corr.</u>, 610 F.3d 1318, 1325 (11th Cir. 2010)(citations omitted).  AEDPA altered the federal court's role in reviewing state prisoner applications in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible

under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002). The following legal principles apply to this case.

## A.  Only Federal Claims are Cognizable

A federal court may entertain an application for a writ of habeas corpus from a person in state custody pursuant to a state court judgment only on the grounds that the petitioner is in custody in violation of the United States Constitution or the laws or treaties of the United States.  28 U.S.C. § 2254(a).  A claimed violation of state law is insufficient to warrant review or relief by a federal court under § 2254.  <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984)(stating "[a] federal court may not issue the writ on the basis of a perceived error of state law."); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991)(stating "[t]oday, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); <u>Waddington v. Sarausad</u>, 555 U.S. 179, 129 S. Ct. 823, 832 n.5 (2009)(same); <u>Cabberiza v. Moore</u>, 217 F.3d 1329, 1333 (11th Cir. 2000)(stating that § 2254 was not enacted to enforce state-created rights); <u>Carrizales v. Wainwright</u>, 699 F.2d 1053, 1055 (11th Cir. 1983)(finding claim involving pure question of state law does not raise issue of constitutional dimension for federal habeas corpus purposes; state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved).

**B.  Federal Claim Must Be Exhausted in State Court**

A § 2254 application cannot be granted unless a petitioner "has exhausted the remedies available in the courts of the State; . . . ."  28 U.S.C. § 2254(b)(1)(A).  This imposes a "total exhaustion" requirement in which all of the federal issues must have first been presented to the state courts.  Rhines v. Weber, 544 U.S. 269, 274 (2005).  "Exhaustion requires that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.  That is, to properly exhaust a claim, the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review."  Mason v. Allen, 605 F.3d 1114, 1119 (11th Cir. 2010)(citing O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) and Castile v. Peoples, 489 U.S. 346, 351 (1989)).

To fairly present a claim, a petitioner must present the *same* federal claim to the state court that he urges the federal court to consider.  A mere citation to the federal constitution in a state court proceeding is insufficient for purposes of exhaustion.  Anderson v. Harless, 459 U.S. 4, 7 (1983).  "'[T]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"  McNair v. Campbell, 416 F.3d 1291, 1302 (11th Cir. 2005) (quoting

<u>Kelley v. Sec'y for the Dep't of Corr.</u>, 377 F.3d 1317, 1343-44 (11th Cir. 2004)).

"The teeth of the exhaustion requirement comes from its handmaiden, the procedural default doctrine." <u>Smith v. Jones</u>, 256 F.3d 1135, 1138 (11th Cir. 2001). Under the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, . . . . ." <u>Smith</u>, 256 F.3d at 1138. A procedural default for failing to exhaust state court remedies will only be excused in two narrow circumstances. First, a petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the asserted error. <u>House v. Bell</u>, 547 U.S. 518, 536-37 (2006); <u>Mize v. Hall</u>, 532 F.3d 1184, 1190 (11th Cir. 2008). Second, under exceptional circumstances, a petitioner may obtain federal habeas review of a procedurally defaulted claim, even without a showing of cause and prejudice, if such review is necessary to correct a fundamental miscarriage of justice. <u>House</u>, 547 U.S. at 536; <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451 (2000).

**C. Deference to State Court Decision**

A federal court must afford a high level of deference to the state court's decision. <u>Ferguson v. Culliver</u>, 527 F.3d 1144, 1146 (11th Cir. 2008). Habeas relief may not be granted with respect to

a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See Berghuis v. Thompkins, 130 S. Ct. 2250, 2259 (2010). A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits which warrants deference. Blankenship v. Hall, 542 F.3d 1253, 1271 (11th Cir. 2008); Ferguson, 527 F.3d at 1146; Wright v. Sec'y Dep't of Corr., 278 F.3d 1245, 1253-54 (11th Cir. 2002). When the last state court rendering judgment affirms without explanation, the Court presumes that it rests on the reasons given in the last reasoned decision. Powell v. Allen, 602 F.3d 1263, 1268 n.2 (11th Cir. 2010)(citing Ylst v. Nunnemaker, 501 U.S. 797, 803-05 (1991)).

"Clearly established federal law" consists of the governing legal principles, rather than the *dicta*, set forth in the decisions of the United States Supreme Court at the time the state court issues its decision. Carey v. Musladin, 549 U.S. 70, 74 (2006)(citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). A state court decision can be deemed "contrary to" the Supreme Court's clearly established precedents within the meaning of § 2254(d)(1) only if: (1) the state court applies a rule that

contradicts the governing law as set forth in Supreme Court cases, or (2) the state court confronts a set of facts that is "materially indistinguishable" from those in a decision of the Supreme Court and yet arrives at a different result. Brown v. Payton, 544 U.S. 133, 141 (2005); Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003). It is not mandatory for a state court decision to cite, or even to be aware of, the relevant Supreme Court precedents, "so long as neither the reasoning nor the result . . . contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002); Mitchell, 540 U.S. at 16.

A state court decision involves an "unreasonable application" of the Supreme Court's precedent if the state court correctly identifies the governing legal principle but applies it to the facts of the petitioner's case in an objectively unreasonable manner, Brown, 544 U.S. at 134; Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000); or, "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Bottoson, 234 F.3d at 531 (quoting Williams, 120 S. Ct. at 1520). The "unreasonable application" inquiry "requires the state court decision to be more than incorrect or erroneous"; it must be "objectively unreasonable," a substantially higher threshold. Renico v. Lett, 130 S. Ct. 1855, 1862 (2010)(citations omitted). Depending upon the legal principle at issue, there can be a range

of reasonable applications. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 663-64 (2004).

A § 2254 petitioner can also obtain relief by showing that a state court decision "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). A factual finding by a state court is presumed to be correct and a petitioner must rebut this "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The Supreme Court has not yet decided whether a petitioner must establish only that a factual finding is unreasonable, or must also rebut the presumption. <u>Wood v. Allen</u>, 130 S. Ct. 841, 848 (2010). In any event, the statutory presumption of correctness "applies only to findings of fact made by the state court, not to mixed determinations of law and fact." <u>Parker v. Head</u>, 244 F.3d 831, 836 (11th Cir. 2001)(citation omitted).

## D.   Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are reviewed under the standards established by 28 U.S.C. § 2254(d). <u>Newland v. Hall</u>, 527 F.3d 1162, 1183 (11th Cir. 2008). Post-AEDPA, the standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), remains applicable to the claims of ineffective assistance of counsel raised in this case. <u>Newland</u>, 527 F.3d at 1184. In <u>Strickland</u>, the Supreme Court established a two-part test to determine whether

a convicted person is entitled to habeas relief on the grounds that his or her counsel rendered ineffective assistance: (1) whether counsel's representation was deficient, *i.e.*, "fell below an objective standard of reasonableness" "under prevailing professional norms," which requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) whether the deficient performance prejudiced the defendant, *i.e.*, there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 688; see also Bobby Van Hook, 558 U.S. ___, 130 S. Ct. 13, 16 (2009). Thus, a habeas court's review of a claim under the Strickland standard is "doubly deferential." Knowles v. Mirzayanze, 556 U.S. 111, 129 S. Ct. 1411, 1420 (2009)(citing Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003)). The Court need not address both components of the Strickland analysis, if the petitioner makes an insufficient showing on one. See Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)(noting that because both parts of the test must be satisfied to show a Sixth Amendment violation, the court need not address the performance prong if the defendant cannot meet he prejudice prong, or vice-versa).

States may "impose whatever specific rules . . . to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." Bobby Van Hook, 130 S. Ct. at 17 (internal quotations and citations omitted).  In demonstrating counsel's deficiency, it is the petitioner who bears the heavy burden to "prove, by a preponderance of the evidence, that counsel's performance was unreasonable." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006), cert. denied sub nom., Jones v. Allen, 549 U.S. 1030 (2006).  A court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct," Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690), applying a "highly deferential" level of judicial scrutiny. Id.  A court must adhere to a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  An attorney is not ineffective for failing to raise or preserve a meritless issue. Ladd v. Jones, 864 F.2d 108, 109-10 (11th Cir.), cert. denied sub nom., Ladd v. Burton, 493 U.S. 842 (1989); United States v. Winfield, 960 F.2d 970, 974 (11th Cir. 1992) ("a lawyer's failure to preserve a meritless issue plainly cannot prejudice a client"). "To state the obvious: the trial lawyers, in every case, could have done something more or something different.  So, omissions are

inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000)(quoting <u>Burger v. Kemp</u>, 483 U.S. 776, 794 (1987)). In finding prejudice, the court must determine that the result of the proceedings would have been different considering "the totality of the evidence before the judge or jury." <u>Berghuis</u>, 130 S. Ct. at 2265 (quoting <u>Strickland</u>, 466 U.S. at 695).

### III. Analysis

**Ground 1– Trial Court Error: Denial of Motion for Acquittal on Robbery Count**

Petitioner argues that the trial court erred by denying his motion for judgment of acquittal on the robbery count because there was insufficient evidence. Petition at 23. Specifically, Petitioner claims that the State failed to produce sufficient evidence to prove that the killing of the victim was motivated, at least in part, by an intent or desire to obtain her car, or other valuables. <u>Id.</u> Instead, Petitioner argues that the evidence at trial only established that the theft was an "after thought."[8] <u>Id.</u>

In Response, Respondent submits that Petitioner did not raise the federal dimension of his trial court error claim concerning the

---

[8]Petitioner also appears to argue that appellate counsel rendered ineffective assistance "by failing to adequately argue the issue on appeal." Petition at 23. The Petition contains no facts in support of this claim. <u>See</u> <u>generally</u> <u>Id.</u> at 23-24, Reply at 2-4. Petitioner does, however, raise an ineffective assistance of appellate counsel claim in Ground Four of the instant Petition.

denial of the judgment of acquittal at trial, or on direct appeal. Response at 11. The basis of Petitioner's claim was wholly a State law claim based upon the State's robbery statute. Id. In the alternative, Respondent turns to the merits of the claim and states that Petitioner did not meet his burden under Winship, 397 U.S. 358 (1970) because the evidence at trial showed that Petitioner required the victims's car not only to get away from the scene, but also to take the victim's body away from the scene in attempt to cover-up the crime committed. Id.

## A. Exhaustion and Procedural Default

Based on a review of the record and binding precedent, the Court finds this claim is unexhausted and procedurally defaulted. Petitioner raised this claim on direct appeal (ground four), but only expressed violations of State law.[9] Exh. 1 at 24, 40-42. Petitioner did not argue that he was denied "due process" or denied a "fair trial" under federal law. Nowhere in his direct appeal brief does Petitioner cite to the United States Constitution or to any Constitutional Amendments. See generally Id. Even the State cases Petitioner cites to on direct appeal concern only matters of State law. Wells v. Sec'y Dep't of Corr., 343 F. App'x 581 (11th Cir. 2009). Florida law precludes Petitioner from now attempting

---

[9]Petitioner also raised this claim in his first Rule 3.850 Motion (Ground G). Exh. 14, Vol., I at 102. The post-conviction court found the ground for relief procedurally-barred because Petitioner raised the claim on direct appeal. Exh. 14, Vol. II at 112.

to raise the federal dimension of this issue before the State courts. Consequently, the Court finds that the federal dimension of Ground One is unexhausted and procedurally barred.

In attempt to overcome this procedural bar, Plaintiff raises a claim of ineffective assistance of appellate counsel as part of Ground Four in the instant Petition. Petitioner claims appellate counsel rendered ineffective assistance by failing to raise the federal dimension of Ground One before the State court. Constitutionally ineffective assistance of counsel can constitute cause to overcome the procedural bar if that claim is not itself procedurally defaulted. Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000); Henderson, 353 F.3d at 896-97. To show "prejudice," petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. Henderson, 353 F.3d at 892. Thus, the Court must determine if Petitioner exhausted his ineffective assistance of appellate counsel claim.

Petitioner states that he filed a state petition for writ of habeas corpus alleging ineffective assistance of appellate counsel. See Petition; Exh. 14, Vol. I at 14 (mentioning state habeas corpus petition raising grounds of ineffective assistance of appellate counsel). However, the Court is unable to determine whether Petitioner raised an ineffective assistance of appellate counsel for failure to raise the federal dimension of Ground One. The

record does not contain a copy of this Motion, the Petition and Reply contain no supporting facts, and Respondent does not dispute that Petitioner filed a state habeas corpus petition. Respondent also fails to address whether Ground Four excuses the procedural default of Ground One.

Therefore, assuming *arguendo* that Petitioner exhausted his ineffective assistance of appellate counsel claim, the Court must next determine whether appellate counsel's ineffectiveness for failure to raise the trial court error claim in terms of federal law constitutes cause and prejudice to overcome the procedural bar. In other words, Petitioner's ineffective assistance of appellate counsel claim must have merit in order to overcome the procedural bar. <u>United States v. Nyhuis</u>, 211 F.3d 1340, 1344 (11th Cir. 2000). The claim has merit if "the arguments the defendant alleges his counsel failed to raise were significant enough to have affected the outcome of his appeal." <u>Id.</u>

Applying <u>Strickland</u>, the Court finds that Petitioner has not shown that appellate counsel rendered deficient performance, or that he was prejudiced by counsel's deficiency. Significantly, Petitioner makes no showing as to either of these grounds in order to overcome the procedural bar of Ground One. <u>See</u> Petition; Reply at 11-12. Instead, Petitioner's claim is only conclusory in nature. Therefore, the Court denies Petitioner relief on Ground One because it is procedurally-defaulted and he has not overcome

the default by establishing cause, prejudice, or a fundamental miscarriage of justice.

**B. Merits**

Turning to the merits of the claim in the alternative, Petitioner's claim fares no better. The Supreme Court has held, in the context of a state prisoner's habeas challenge to the sufficiency of the evidence to support his conviction, that the "critical inquiry" is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979), overruled on other grounds, Schlup v. Delo, 513 U.S. 298 (1995). It is the duty of the jury to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Id. The federal court does not substitute its judgment as to whether it believes the evidence to be sufficient to sustain a conviction. Id. The federal court is bound by the state's interpretation of a state criminal statute. Garcia v. Perringer, 878 F.2d 360, 362 (11th Cir. 1989)(citations omitted). The essential elements of the applicable charge in this case are set out in § 812.13, Florida Statutes (1997). According to § 812.12, the force, violence, or intimidation may occur prior to, contemporaneous with, or subsequent to the taking of property, so long as both the act of force, violence, or

intimidation and the taking constitute a continuous series of acts or events.  In this case, the following evidence was introduced at trial:

> that [the victim] was attacked immediately after she left the safety of Charron's house.  Within 30 seconds of being attacked, [Petitioner Mycoff] had stolen her car. Since [Petitioner Mycoff] had walked to Charron's residence, he needed a vehicle to leave the scene of the homicide and to carry away the body– a fact of which he was aware as he crouched behind the boat with the baseball bat in his hand before he killed her.  This evidence of premeditation supports the State's theory of the case and negates [Petitioner's] reasonable hypothesis of innocence– that the thefts were an afterthought brought about by panic following [the victim's] murder.

Exh. 2 at 44.  Therefore, after viewing the evidence in the light most favorable to the prosecution, the Court finds that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  The state court's decision was neither contrary to, nor an unreasonable application of federal law established by the United States Supreme Court.  The facts were not unreasonable based on the evidence presented. Accordingly, Petitioner is denied relief on the merits of Ground One.

**Ground 2– Trial court error: Jury Instruction Issue**

Petitioner alleges that the trial court erred by denying his request to include in the jury instruction the "after thought" defense to the robbery.  Petitioner submits that "due to the improper refusal," he "was deprived of an extremely valuable defence [sic]."  Id. at 26.  Petitioner argues that had the jury

been given the afterthought instruction, the jury would not have convicted him of robbery.  Petition at 26-27.

In Response, Respondent improperly addresses Ground Two as one alleging ineffective assistance of counsel based on counsel's failure to argue the "afterthought instruction" "strenuously enough."  Response at 13.  Respondent submits that Petitioner cannot fault trial counsel for seeking an instruction, which was rejected by the trial court.  Id.  Respondent further submits that he cannot claim appellate counsel was remiss because appellate counsel raised this claim on direct appeal.  Id.

## A.  Exhaustion and Procedural Default

Based on a review of the record and binding precedent, the Court finds this claim is unexhausted and procedurally defaulted. Petitioner raised this claim on direct appeal (ground 5), but only expressed violations of State law.  Exh. 1 at 42-43.  Petitioner did not argue that he was denied "due process" or denied a "fair trial" under federal law.  Nowhere in his direct appeal brief does Petitioner cite to the United States Constitution or to any Constitutional Amendments.  See generally Id.  Even the State cases Petitioner cites to on direct appeal concern only matters of State law.  Wells v. Sec'y Dep't of Corr., 343 F. App'x 581 (11th Cir. 2009).  Petitioner would now be barred from raising this claim in the Florida courts.  Consequently, the Court finds that the federal

dimension of Ground Two is unexhausted and procedurally barred. Duncan v. Henry, 513 U.S. 364, 366 (1995).

In attempt to overcome the procedural bar of Ground Two, Petitioner raises a claim of ineffective assistance of appellate counsel as part of Ground Four in the instant Petition. Petitioner claims appellate counsel rendered ineffective assistance by failing to raise the federal dimension of Ground Two before the State court. As discussed above, constitutionally ineffective assistance of counsel can constitute cause to overcome the procedural bar if that claim is not itself procedurally defaulted. Edwards, 529 U.S. at 451-52; Henderson, 353 F.3d at 896-97. To show "prejudice," petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. Henderson, 353 F.3d at 892. Thus, the Court must determine if Petitioner exhausted his ineffective assistance of appellate counsel claim.

As discussed above in Ground One, the Court is unable to determine whether Petitioner raised an ineffective assistance of appellate counsel for failure to raise the federal dimension of Ground Two because the record does not contain a copy of this state petition. Both Petitioner and Respondent fail to fully develop this issue.[10]  Assuming *arguendo* that Petitioner exhausted his

---

[10]The record supports that Petitioner filed a state habeas corpus raising ineffective assistance of appellate counsel because the state petition is mentioned elsewhere in the record and was not

(continued...)

ineffective assistance of appellate counsel claim, the Court must next determine whether appellate counsel's ineffectiveness for failure to raise the trial court error claim in terms of federal law has merit.

Applying Strickland, the Court finds that Petitioner has not shown that appellate counsel rendered deficient performance, or that he was prejudiced by counsel's deficiency. Significantly, Petitioner makes no showing as to either of these grounds in order to overcome the procedural bar of Ground Two. See Petition; Reply at 11-12. Instead, Petitioner's claim is only conclusory in nature. Therefore, the Court denies Petitioner relief on Ground Two because it is procedurally-defaulted and he has not overcome the default by establishing cause, prejudice, or a fundamental miscarriage of justice.

**B.  Merits**

Even if Petitioner had exhausted this claim, the Court finds in the alternative that the claim has no substantive merit. The record shows that before closing argument, defense counsel requested a special instruction on afterthought.[11] Exh. 13, Vol.

---

[10](...continued)
disputed at that time. See Petition; Exh. 14, Vol. I at 14 (mentioning state habeas corpus petition raising grounds of ineffective assistance of appellate counsel).

[11]Apparently, the afterthought instruction on felony murder is as follows: that if the jury found Petitioner took the victim's property after she was killed, then the taking was an afterthought which may constitute theft, but does not constitute robbery. Fla.
(continued...)

IX at 996-998. The prosecution opposed the afterthought instruction and argued that it was already included in the jury instruction to the extent the instruction described the element of intent. Thus, the prosecution argued that the special instruction would give "afterthought" more weight than entitled because it was already referenced in the instructions. The trial court denied Petitioner's request for the afterthought instruction, but allowed counsel to discuss afterthought during closing argument. Id.

Petitioner raised a claim of trial court error on direct appeal concerning the court's failure to give the afterthought instruction and the appellate court *per curiam* affirmed the trial court. The State courts' interpretation of State law binds a federal court sitting in habeas corpus. Bradshaw v. Richey, 546 U.S. 74, 76 (2005). Therefore, the Court must defer to the State courts' determinations as to this matter.

In the Petition, Petitioner raises no federal or constitutional arguments as to the failure to read the jury the afterthought instruction. Instead, Petitioner re-argues the State law grounds raised on direct appeal. Petition at 25-26. Thus, Petitioner has failed to demonstrate that he was entitled to an instruction concerning theft as a mere afterthought. Moreover, the jury found Petitioner guilty of the lesser-included offense of

---

[11](...continued)
Stat. 782.04(1)(a)(2)(d).

felony murder when they returned a guilty verdict of manslaughter and robbery.  Thus, the Court finds that the State courts' decision neither was contrary to nor involved an unreasonable application of federal law.  The facts were not unreasonable based on the evidence presented.  Therefore, in the alternative, Petitioner is denied relief on Ground Two on the merits.

### Ground 3-  Trial Court error: limiting cross-examination of Jim Charron; improper impeachment of Petitioner; and, improperly limiting Petitioner's testimony

Petitioner claims the trial court erred by limiting the cross-examination of the State's witness, Jim Charron, and prevented the introduction of evidence that Charron was fired from his job for sexual harassment.  Petition at 28.  Petitioner also claims that the trial court erred when it permitted the State to impeach him by implying that he "worked" with defense counsel on the case.  Id. Last, Petitioner claims the trial court erred by limiting his testimony about the specifics of his prior convictions.  Id. Petitioner argues these errors contributed to the jury's verdict because "the trial outcome was close, [and] consisted of a heated credibility contest between Charron and Mycoff."  Id. at 29.

In Response, Respondent states that Petitioner is challenging the trial court's rulings on admissibility of evidence, which is not a proper § 2254 issue.  Response at 14 (citing Tidwell v. Butler, 415 F. App'x 979, 980 (11th Cir. 2011)).

## A.  Exhaustion and Procedural Default

Based on a review of the record and binding precedent, the Court finds this claim is unexhausted and procedurally defaulted. Petitioner raised sub-parts one and two of this ground on direct appeal (grounds 1 & 2), but only expressed violations of State law.[12]  Exh. 1 at 26-32.  Petitioner did not argue that he was denied "due process" or denied a "fair trial" under federal law. Nowhere in his direct appeal brief does Petitioner cite to the United States Constitution or to any Constitutional Amendments. See generally Id.  With regard to sub-part three, Petitioner raised this claim in his supplemental brief on direct appeal, but raised the claim according to State law only.  See Exh. 1.  Petitioner is now barred from raising this claim in the Florida courts. Consequently, the Court finds that the federal dimension of sub-parts one, two, and three are unexhausted and procedurally barred. Duncan v. Henry, 513 U.S. 364, 366 (1995).

Similar to the aforementioned grounds, in attempt to overcome the procedural bar of Ground Three, Plaintiff raises a claim of ineffective assistance of appellate counsel as part of Ground Four in the instant Petition.  Petitioner claims appellate counsel

_____

[12]Petitioner also raised sub-parts one and two in his Rule 3.850 Motion as (e) and (c), respectively.  The post-conviction court, noting that Petitioner raised these trial court error claims on direct appeal, found them procedurally barred.  Exh. 14, Vol. I at 110-111.

rendered ineffective assistance by failing to raise the federal dimension of Ground Three before the State court.

As previously mentioned, the Court is unable to determine whether Petitioner raised an ineffective assistance of appellate counsel for failure to raise the federal dimension of Ground Three because the record does not contain a copy of this state petition. Both Petitioner and Respondent fail to fully develop this issue. Assuming *arguendo* that Petitioner exhausted his ineffective assistance of appellate counsel claim, the Court must next determine whether appellate counsel's ineffectiveness for failure to raise these trial court error claims in terms of federal law has merit.

Applying <u>Strickland</u>, the Court finds that Petitioner has not shown that appellate counsel rendered deficient performance, or that he was prejudiced by counsel's deficiency. Significantly, Petitioner makes no showing as to either of these grounds in order to overcome the procedural bar of Ground Three. <u>See</u> Petition; Reply at 11-12. Instead, Petitioner's claim is only conclusory in nature. Therefore, the Court denies Petitioner relief on Ground Three because it is procedurally-defaulted and he has not overcome the default by establishing cause, prejudice, or a fundamental miscarriage of justice.

## B. Merits

In the alternative, the Court finds the merits of Ground Three fare no better. Indeed, the federal court's review of a trial court's actions in the admission of evidence is generally limited. Osborne v. Wainwright, 720 F.2d 1237, 1238 (11th Cir. 1983)(citations omitted). The federal court will, however, review a claim involving admission or exclusion of evidence that deprives the defendant of fundamental fairness. Id. at 1238. "The admission of prejudicial evidence justifies habeas corpus relief only if the evidence 'is material in the sense of crucial, critical, highly significant factor.'" Id.

Upon review of the record, the trial court's rulings were not so critical as to deny Petitioner a fundamentally fair trial. To the extent Petitioner claims that the trial court erred by not allowing evidence of Charron's termination from his employment for sexual harassment, the trial court found that this evidence was not relevant to Charron's credibility. In other words, whether or not this witness had been fired for sexual harassment at some indeterminate time in the past had nothing to do with Charron's truth and veracity at the time he testified at trial in the instant case. To the extent that Petitioner claims the State improperly bolstered Charron's credibility with the fact that he was employed as a pharmacist, the record shows, to the contrary, that it was defense counsel who kept raising the fact that Charron was a

pharmacist.  See generally Vol. 10.  Based on the record, it appears that defense counsel's trial strategy was to show that Charron was an educated man; and, therefore, an educated man would not have made the statements or decisions he made the evening of the victim's murder.  In sum, defense counsel attempted to cast blame, or suspicion, on Jeff Charron, instead of Petitioner, by using the fact that Charron was an "educated man."

Contrary to Petitioner's assertions that the trial was a credibility contest between the State's witness, Jeff Charron, and himself, evidence was introduced at trial that supported the jury's finding of guilt, including several statements from Petitioner admitting that he murdered the victim, Patricia Northrup.  In pertinent part, the jury heard the following testimony:[13]

Petitioner lived with his mother two streets over from Jeffrey Charron's house, and two houses over from Charron's father.  Exh. 13, Vol. 5 at 74-75.  Charron and Petitioner were acquaintances, not friends.  Id. at 75.

**Sunday, August 31, 1997**

Adam Stander, a friend of victim Patricia Northup, agreed to go out that night.  Id. at 50.

---

[13]The Court adopts the State's version of the evidence as presented in its response brief to Petitioner's direct appeal brief.  Exh. 2.  The Court has also independently located the facts in the record of the trial transcript. See generally Exh. 13.

Earlier that morning, starting around 8:00 a.m.– 9:00 a.m., Petitioner helped Charron's father put in an above-the-ground pool. Exh. 13, Vol. 6 at 381-383.

Around 5:30 p.m., Charron arrived at his father's house and observed Petitioner working.[14]  Charron made plans with Petitioner to go out that evening.  Vol. 5 at 77; Vol. 6 at 384.

 Both Petitioner and Charron went to their respective homes to shower.  Vol. 5 at 77-78

Petitioner walked to Charron's residence.  He was wearing jeans, cowboy boots, and a green and white dress shirt.  Vol. 5 at 78; Vol. 7 at 514.  They immediately left in Charron's truck to go "bar hopping."  Vol. 5 at 78-79.

At 7:00 p.m., Stander arrived at Northrup's house.  Vol. V at 51.  Northrup was wearing tight black, spandex pants and a halter top with a short shirt over it.[15]  Vol. 5 at 125-26.

---

[14]Charron testified that he arrived at his father's house around 5:30 p.m., after he got off work.  Petitioner told police that Charron had been at the residence all day helping install the pool.  Vol. VI at 385.  By the time of trial, Petitioner said Charron had arrived to help with the pool at 1:30 p.m.  Vol. 9 at 939.

[15]Petitioner stated Northrup looked "like mama has got her with a stick when she was younger."  Vol. 6 at 391.  She had a "nice ass, small tits, good looking girl."  Vol. 7 at 400.  "I thought [her dress] was kind of sleazy myself."  Vol. 7 at 402.  She was wearing a "[k]inda sleazy top, tight pants."  Vol. 8 at 674. "Showing her tits off, tight.  It kinda comes right below her tits, sorta like a cut off type muscle shirt."  Vol. 8 at 675.  He noted that she did not appear to be wearing a bra. Vol. 8 at 675.

At 8:00 p.m., Petitioner and Charron arrived at Spud's. At about this same time Stander and Northrup left Northrup's residence and went to Shooters. Vol. 5 at 52-53. They had drinks at the tiki bar.

At 8:30 p.m.-8:45 p.m., Petitioner and Charron left Spud's and headed to Shooters. Vol. 5 at 80-82.

At Shooter's, Northrup recognized Charron, who used to be her ex-boyfriend's roommate. Vol. 5 at 64, 73, 82-83. She called him over and they began talking. Id. at 56, 84. Northrup and Charron introduced each other to their respective friends, Stander and Petitioner. Vol. 5 at 56, 63-64, 87. But it was Charron and Northrup who were talking "very intensely" and who seemed to be attracted to each other. Vol. 5 at 58.

Northrup wanted to go to Ricochet's. Vol. 5 at 88. Petitioner and Charron agreed to go. Id. at 88-89, Vol. 9 at 940. Northrup invited Strander to go too, but Strander declined because he had to work the next day.

At 11:00 p.m., the four left Shooters. Vol. 5 at 57. Northrup and Stander got into Northrup's car, and Petitioner and Charron got into Charron's truck. Charron followed Northrup to her house. Id. at 59, 89-90, Vol. 6 at 390, 394. There Stander got in his own vehicle and left. Vol. 5 at 61, 91; Vol. 6 at 397; Vol. 9 at 941.

Around 11:30 p.m., Charron and Petitioner, in Charron's truck, followed Northrup, in her car, to Ricochet's.  Vol. 5 at 91; Vol 6 at 398.  The three of them sat at the bar.  Vol. 5 at 94-95.  Petitioner and Northrup danced three or four times.  Vol. 5 at 95-96.

**Monday, September 1, 1997 (Labor Day)**

Around 1:00 a.m.-1:45 a.m., Charron, Northrup and Petitioner left Ricochet's.  Northrup got into her car.  Petitioner wanted to drive Charron's truck because he wanted to stop several places, and Charron let him.  Vol. 5 at 97; Vol. 6 at 259-60.  Charron took back roads with Northrup following them.  Vol. 5 at 98.

At 1:45 a.m., they stopped at a convenience store and bought beer and cigarettes.  Vol. 5 at 99; Vol. 7 at 405; Vol. 8 at 649; Vol. 9 at 944.  Petitioner told Charron that he wanted to stop by a friend's house because the friend owed him money.  Vol. 5 at 99; Vol. 9 at 945, 969.  They stopped at a residence.  Petitioner went up the driveway and came back about 15 seconds later.  Vol. 5 at 100; Vol. 9 at 945.  With Petitioner still driving they stopped at another Circle K so Charron could buy a box of three condoms.  He thought he may have sex with Northrup.  Vol. 5 at 101-02; Vol. 8 at 649; Vol. 9 at 945.

From there Petitioner drove to his own home, because he had to "do something."  Vol. 5 at 102; Vol. 9 at 945-46.  Petitioner got

out and went into his home.[16]  Charron drove to his home two streets

over with Northrup following behind him.  Vol. 5 at 103.  Charron

parked the truck in his driveway next to a boat.  Vol. 5 at 104,

108.  Northrup parked in a grassy circle in the middle of the cul-

de-sac.  Vol. 5 at 105; Vol 7 at 501.  The two of them entered

Charron's home.  Vol. 5 at 107.

Charron put on some music, and he and Northrup sat down on the

floor.  Vol. 5 at 108, 178.  They talked, drank beer, and kissed

for 15-20 minutes.  Vol. 5 at 108, 110.

Petitioner discovered he was out of beer and walked to

Charron's house and rang the doorbell.  Vol. 5 at 110; Vol. 9 at

947.  Charron walked out the back door and around the front because

he was afraid it might be his ex-girlfriend, and "[He] didn't want

any cat fight."  Vol. 5 at 110.  He observed Petitioner sitting on

the retaining wall.  Vol. 5 at 111; Vol. 7 at 411-12.  Charron told

Petitioner to come in for a beer.  Vol. 5 at 111.  The two of them

walked around to the back door, because the front door was locked.

Vol. 5 at 111.  Inside Northrup was laying on the carpet.[17]  Vol.

_____

[16]In Petitioner's first and second recorded statements taken by
law enforcement officials, Petitioner states that all three of them
had gone to Charron's home.  Vol. 7 at 408; Vol. 8 at 649.  Then
Petitioner had walked home.  But he wanted more beer, so he walked
back to Charron's house.  Vol. 7 at 411-12, Vol 8 at 652-53.

[17]In Petitioner's initial statement to police, Petitioner
claimed that when he entered the house, Northrup was sitting on the
couch.  Vol. 7 at 412.  In his second recorded statement,
Petitioner claimed that when he entered the house, Northrup was
lying on the carpet, passed out but breathing. Vol. 8 at 653-54.

5 at 111.  Petitioner had a beer while Charron sat back down on the floor with Northrup.  Vol. 5 at 111.  Charron massaged her back.  They ended up taking off their clothes and having sex "[d]oggie style."  Charron wore one of the condoms.  Vol. 5 at 112, 189.  They had sex for 15-20 minutes, and Petitioner watched from the lanai.  Vol. 5 at 114, 186-88.

When they were finished, Charron got up and went to the kitchen to throw the condom in the garbage.  He got a beer out of the refrigerator and returned to the living room.  Vol. 5 at 115.  Petitioner was wearing only his underwear, and was massaging Northrup.  Vol. 5 at 1117.  Northrup was still lying face down and Petitioner was behind her.  Vol. 5 at 118.  Charron put his pants back on.  Vol. 5 at 117.  He went outside and sat on the sea wall.  Vol. 5 at 118.  He could hear moaning inside.  Vol. 5 at 119.

After about 20 minutes, Charron went inside and observed Petitioner having sex with Northrup "doggie style."  Vol. 5 at 120-21, 193).  As Charron started to go outside, Northrup looked up and saw Charron.  She then told Petitioner twice to stop what he was doing to her.[18]  Vol. 5 at 121.  Charron also told Petitioner to stop.  Vol. 5 at 122.  Petitioner withdrew and sat back on his knees without saying anything.  Id.  Northrup turned around and told Petitioner that she was going to call the police and report

_____

[18]It was dim in the house (Vol. 5 at 192), and combined with her intoxication, Northrup apparently did not realize that her sex partner had changed.

him for rape.  Id.  Charron thought that did not make sense, because Northrup and Petitioner has been having sex for 20 minutes. Id.

Charron went inside his bedroom, took off his pants, and got into bed.  Vol. 5 at 123.  His bedroom door was opened, and he did not hear any conversation.  Vol. 5 at 124.  After about five minutes, he heard a door close, and he thought it was Petitioner and Northrup leaving.  Vol. 5 at 124-25, 199.  But then Northrup (fully dressed) entered his room.  Charron got out of bed.  Vol. 5 at 125-126.  Northrup told Charron, "I can't believe he did that to me [.]  [] I want to call the cops on him[.]"  Vol. 5 at 125. Charron told Northrup that she could use his phone if she was serious.  Vol. 5 at 125, 200.  Instead, Northrup decided to leave. Vol. 5 at 125, 200.

Charron put on a pair of shorts to walk Northrup out of the house.  Vol. 5 at 125.  Charron opened the door and turned on the lights, and they walked outside.  Vol. 5 at 126.  Northrup had car keys in her hand.  Vol. 5 at 146-46.  Charron walked to the end of his truck in the driveway and stopped.  Vol. 5 at 126.  He watched Northrup walking to her car.  Id. at 127.  Charron testified, "she got about halfway across the street and [Petitioner] ran from behind my boat, right behind her and hit her in the head with my baseball bat."  Vol. 5 at 127.  Petitioner did not say a word. Northrup did not see him coming.  Id. at 128.  The bat struck her

in the back of the head and she fell to the ground.  Id. at 128-29.
Charron was afraid of Petitioner and ran into the house.  Id. at
129, 202.  As he entered the house, Charron heard another loud
noise, "[l]ike the noise of him hitting her in the head the first
time."  Id. at 129, Vol. 6 at 209.  Charron was not sure if
Petitioner had seen him witness the crime.  Vol. 5 at 154.

Charron called the police.  Around 4:25 a.m., Deputy Petracca
was dispatched to Charron's residence.  He arrived within 10
minutes. Vol. 6 at 279.  Charron told the deputy that there had
been a conflict in front of the house.  Vol. 5 at 142.  He still
did not mention anything about seeing Northrup attacked with the
baseball bat because he was afraid of Petitioner.  Id.  Because the
information provided was so limited, Deputy Petracca did not even
prepare a written report.  Vol. 6 at 276.  The deputy left after
10 minutes.  Vol. 5 at 143.  As the sun was coming up, Charron went
to his father's house where he remained for several weeks, only
stopping at his residence to get clothing.  Vol. 5 at 147.

Petitioner's version of the events were quite different.  In
Petitioner's first statement to police, he denied that he had taken
his clothes off at Charron's house (Vol. 7 at 516), or that either
he or Charron had sex with Northrup.  Vol. 7 at 413, 452, 517.
Petitioner states that none of the three of them argued.  Vol. 7 at
475.  Petitioner first claimed that when Northrup walked out to the
car, she did not trip or stumble.  Vol. 7 at 504, 509.  But later

in the statement he claimed that Charron had to help her out to her car, and that she could have been stumbling.  Vol. 7 at 527-28. Petitioner claimed that he and Northrup left Charron's residence about the same time, she dropped Petitioner off at his home, and left.  Vol. 7 at 527-28.  Petitioner stated that he had not lost any article of clothing at Charron's house.  Vol. 7 at 516-17.  He specifically claimed that his boots were at his own home.  Vol. 7 at 519.  Then in the same statement he admitted that he had taken off his boots at Charron's house and they were still there, along with his shirt.  Vol. 7 at 532, 581. He stated that he never drove Northrup's car.  Vol. 7 at 465, 521-22, 524.  Petitioner described Charron as "laid back" and "easy going" without a bad temper.  Vol. 7 at 449.

In his second recorded statement, Petitioner still maintained that there was no sex.  Vol. 8 at 655.  He took his boots off at Charron's residence and forgot them.  Vol. 8 at 658. He initially stated that he walked home (Vol. 8 at 659), but then immediately corrected that and said that Northrup had given him a ride home. Vol. 8 at 660.  This version had Petitioner, not Northrup, stumbling outside.  He had a beer bottle in his hand when he got into Northrup's car.  Vol. 8 at 663.  Petitioner said that the only way he would have had a bat in his hand is if he and Charron had been in a fight and Northrup had gotten in the way of the bat.[19]

_____

[19]Charron testified that he kept the bat near his front door.

-40-

Vol. 8 at 667-68, 688, 702-703.  Or, that Petitioner had hit Northrup in the head by mistaking her for Charron.  Vol. 8 at 715-16.  He claimed to have a blackout for the moment of the crime. Vol. 8 at 697.  But Petitioner also admitted, "I still got it on my conscious for the rest of my life now I killed somebody."  Vol. 8 at 724.

By the time of trial, Petitioner's version of the events was as follows.  Petitioner claimed to have a clear recollection of that night.  Vol. 98 at 971-72.  When he entered the house through the back door, he observed Northrup lying face down on the floor. Vol. 9 at 949.  Charron explained that she was passed out, but Petitioner observed that the side of her head and her hair were matted with blood. Vol. 9 at 949.  Petitioner yelled to Charron, "what the hell did you do."  Id.  Petitioner insisted they get help, but Charron declined, protesting, "she made me do it."  Vol. 9 at 950.  Eventually agreeing to get some help, Charron helped Petitioner put Northrup in the back seat of her car to go to the hospital.  Vol. 9 at 950-51.  Charron brought a black coat containing the bat and Northrup's keys out of his bedroom and put them in the car.  Vol. 9 at 951.

Petitioner drove the car toward the hospital with Charron following in Charron's truck.  But eventually Charron turned around.  Vol. 9 at 952.  Petitioner decided to dump the victim's

body rather than continue on to the hospital and possibly get himself in trouble.  Vol. 9 at 952-53.

Petitioner drove Northrup's car toward the Greenbriar of Lehigh.  En route he heard her wheezing, "[l]ike somebody was kinda half ass snoring and then it stopped."  Vol. 8 at 727.  At trial, Petitioner described it was "sorta like a snore, grunt sorta thing" (Vol. 9 at 953) and a "wheezing sound."  Vol. 9 at 988.  He turned around and touched her.  She was clammy.  She stopped breathing.  Vol. 8 at 729, Vol. 9 at 953.  At Greenbriar, Petitioner dumped the victim's body out of the car and threw the bat in the opposite direction.[20]  Petitioner then fled in Northrup's car.  Vol. 8 at 732-34.

Petitioner drove Northrup's car to the residence of Briget Cooks.  Vol. 6 at 302-03.  Petitioner visited the Cooks' residence two to four times per week to smoke crack.  Vol. 6 at 305.  Cooks asked Petitioner if she could use the car to go to the store, and

---

[20]In Petitioner's second recorded statement, Petitioner claimed to have dumped the body 10-15 miles away at Omni Park, not Greenbriar.  Vol. 8 at 732.  By the time of trial, Petitioner changed the dump location to yet another area, beside the road.  Vol. 9 at 953.  Petitioner claimed that he also threw out everything in the backseat.  Vol. 9 at 953.  This was not true because Patricia Northrup's purse ended up at Cooks' residence where Petitioner took the car.  Vol. 10 at 1086.  As the prosecutor pointed out in closing argument, Petitioner had to cling to the story that he dumped the body anywhere besides Greenbriar because Greenbriar was a place associated exclusively with Petitioner and not Charron.  Exh. 10 at 1085.  For the events to fit Petitioner's story, Charron would have had to find the body alongside the road, pack it in his truck, and take it to a place where it just so happened Petitioner fished on a regular basis.  Vol. 10 at 1085.

Petitioner agreed. Vol. 6 at 303. She specifically asked Petitioner if the car was stolen, and he said no. Vol. 6 at 304, Vol. 9 at 954. Cooks testified that when she got in the car, she saw and smelled fresh blood. Vol. 6 at 304, Vol. 8 at 780-786. When she asked Petitioner about it, Petitioner responded that he had been hunting. Vol. 6 at 304. At some point after Petitioner left Northrup's car at Cooks' residence, prostitute Patricia Garza found a purse inside a backpack at Cooks' residence containing Northrup's identification. Vol. 6 at 316-17, 320.

At 9:00 p.m., Duane Fuller came to Cooks' residence and observed Petitioner come out of the back room. Vol. 6 at 311. Fuller stated that Petitioner was dirty, wearing shorts, but no shirt and no shoes, and he "kind of looked like he had been partying for a few days[.]" Vol. 6 at 311. Petitioner asked Fuller for a ride, and Fuller took Petitioner to Fuller's brother's residence. Vol. 6 at 311-312; Vol. 8 at 679; Vol. 9 at 954. There they smoked some crack. Petitioner told Fuller, "I think I've done something that I'm going to fry for, I'm in trouble." Vol. 6 at 312; Vol. 9 at 968, 975. Petitioner then walked home. Vol. 9 at 954.

Therefore, based on a review of the record, even if the trial court had erred by not allowing the defense to allow testimony from Charron that he had been fired for sexual harassment, the record overwhelmingly supports the jury's finding of guilt. The Court

finds that the State courts' decision was neither contrary to nor involved an unreasonable application of federal law. The facts were not unreasonable based on the evidence presented. Therefore, in the alternative, Petitioner is denied relief on the merits of subpart 1, in Ground Three.

In subpart 2 of Ground Three, Petitioner contends that the trial court allowed the prosecution to improperly impeach him on cross-examination by suggesting he had time to prepare and make up his testimony:

> PROSECUTION: How long have you been working with [defense counsel] on this case?
>
> PETITIONER: Since probably July of last year.
>
> PROSECUTOR: This is a very important event for you, this trial, isn't it?
>
> PETITIONER: Yes, sir, it is.
>
> PROSECUTOR: You've read all the witness statements?
>
> PETITIONER: Yes, sir, I've went over them.
>
> PROSECUTOR: Looked over all the evidence?
>
> PETITIONER: Yes, sir.
>
> PROSECUTOR: And then come in here and tell a jury a story that can kind of fit that, isn't that what you've done?
>
> PETITIONER: No, sir that's not true.

Vol. 10 at 977-78. The record shows that during closing argument, the prosecutor noted, "[Petitioner] gave a lot of stories in this

case, and each one changed with how much he learned that the law enforcement knew." Vol. 10 at 1022-24. The argument continued:

> Jeff Charron told all of his statements to law enforcement within a week without the availability of looking at all the other evidence in this case. This man has had a year and eight months and he's looked and heard and seen every bit of evidence, and then comes in here and tells you this story.

Vol. 10 at 1080.

Petitioner argues in his Reply that the prosecution's statements told "the jury to do something it is specifically directed not to do, i.e. discount a witness [sic] credibility because he discussed his testimony with an attorney." Reply at 9. Petitioner further argues that the prosecution's arguments "impermissibl[y] referred to Petitioner's pre-trial silence." Reply at 9.

As evidenced by the record, set forth, in pertinent part, _infra_, Petitioner's version of the events leading to Northrup's death changed several times. Petitioner's version of the events changed from the first statement he gave to police on September 7, 1997, to the second statement he gave on September 9, 1997, to the third statement he gave on September 10, 1997, and then again when he testified in-court before the jury. Compare Vol. 6 at 367 (stating he was at work in Naples and could not come to police station when caller identification showed he was calling from a Walmart in Lehigh Acres); Vol. 1 at 33, 64, 71, 115, 130; Vol. 6 at

367, 376-77 (first statement given to police); Vol. 1 at 143, Vol. 2 at 212-13, Vol. 8 at 646, 707 (second taped statement); Vol. 2 at 217, 225-26 (third taped statement); Vol. 9 (in-court testimony). Thus, contrary to Petitioner's assertions, the prosecutor did not direct the jury to discredit Petitioner's testimony because he discussed the case with his attorney. Rather, the prosecution's statements revealed the State's theory as to why there was a difference between all of Petitioner's prior statements and again a change in his statements during his in-court testimony– that he had time to change his story a third time after reviewing the evidence and talking with defense counsel. Also, the record refutes Petitioner's allegations that the prosecutor improperly referred to "Petitioner's pre-trial silence." To the contrary, the record shows Petitioner made several pre-trial statements and did not remain silent. Based on the record, the Court finds that the State courts' decision neither was contrary to nor involved an unreasonable application of federal law. The facts were not unreasonable based on the evidence presented. Therefore, in the alternative, Petitioner is denied relief on the merits of sub-part 2, in Ground Three.

In sub-part 3 of Ground Three, Petitioner contends that the trial court improperly limited his testimony regarding the specifics of prior convictions. Specifically, Petitioner contends

he should have been allowed to testify about the non-violent nature of his six prior felonies. Reply at 10.

The Court incorporates by reference the State's brief in response to Petitioner's brief on direct appeal. <u>See</u> Vol. 4. Petitioner has not established how the trial court's decision to sustain the prosecution's objection to the question posed by defense counsel to Petitioner deprived him of a fundamentally fair trial. The record shows defense counsel did not attempt to re-phrase the question. Further, as pointed out by the State, at a different point during the trial, the jury heard testimony from Petitioner stating that he was not a violent person. <u>Id.</u> Based on the record, the Court finds that the State courts' decision neither was contrary to nor involved an unreasonable application of federal law. The facts were not unreasonable based on the evidence presented. Therefore, in the alternative, Petitioner is denied relief on the merits of sub-part 3, in Ground Three.

### Ground 4– Ineffective assistance of appellate counsel

Petitioner claims appellate counsel rendered ineffective assistance on direct appeal for failing to file a reply brief; failing to timely move for rehearing; and, for failing to distinguish certain State cases.[21] Petition at 30-32.

---

[21]As noted <u>supra</u>, Petitioner also alleges appellate counsel rendered ineffective assistance for failing to raise the federal dimension of Ground One, Two, and Three above. The Court previously discussed this argument in Grounds One, Two, and Three.

In Response to Petitioner's argument concerning the lack of reply brief and motion for rehearing, Respondent refers the Court to Fla. R. App. P. 9.210(d) and <u>Beasley v. State</u>, 774 So. 2d 649 (Fla. 2000). Response at 15. Respondent further states that Petitioner neither meets his burden under <u>Strickland</u> to show that appellate counsel rendered ineffective assistance of counsel, nor does he point to any United States Supreme Court precedent that would justify relief. <u>Id.</u> at 16.

Assuming Petitioner has properly exhausted these claims of ineffective assistance of appellate counsel, the Court finds Petitioner is not entitled to relief on the merits. Petitioner has neither shown that appellate counsel rendered deficient performance, or that counsel's performance caused him prejudice as required under <u>Strickland</u> based on appellate counsel's failure to filing a reply to the State's answer brief and failure to move for rehearing after the appellate court issued mandate. Additionally, Petitioner has not established how appellate counsel rendered deficient performance for not citing to a case that Petitioner purports had bearing on his case, when that case was not decided until <u>after</u> the appellate court issued mandate. <u>See</u> Response. Thus, the Court finds that the State courts' decision was neither contrary to nor involved an unreasonable application of federal law. The facts were not unreasonable based on the evidence presented. Therefore, Petitioner is denied relief on Ground Four.

**Ground 5- Trial court error: Admission of statements**

Petitioner claims the trial court violated <u>Miranda</u> when it denied Petitioner's motion to suppress pre-trial statements he gave to police on September 9 and 10, 1997. Petition at 33. Petitioner states that the evidence shows he "unequivocally invoked his right to counsel at the conclusion of his first statement." <u>Id.</u> Thus, Petitioner argues that law enforcement officials were prohibited from reinitiating contact with him the next day. <u>Id.</u> Petitioner submits these violations amounted to an unreasonable application of <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981) and <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980). <u>Id.</u>

In Response, Respondent notes that the trial court held an evidentiary hearing on this matter prior to trial. Response at 16-17. Respondent submits that this very issue was addressed by the trial court and was raised as issue three in Petitioner's direct appeal. Respondent also distinguishes the cases cited by Petitioner from the instant situation.

Before trial began, defense counsel filed a motion to suppress. Exh. 14, Vol. II at 146-150. After holding a suppression hearing, the trial court denied Petitioner's motion to suppress and entered a written order as follows:

> Having reviewed the transcript of the proceedings and your memoranda pertaining to the Defendant's Motion to Suppress, I find the following:
>
>     1. Defendant's statements were freely and voluntarily entered into.

2.   There is no merit in the contention that the
defendant was incapacitated by alcohol or drugs.

        3.   The Court has heard portions of the recorded
statements and the Defendant sounded lucid and coherent
and spoke with the ability to both order and communicate
his thoughts.

        4.   The Court finds no merit in the Defendant's
contention of a violation of Edwards v. Arizona, 451 U.S.
477 (1981).

Id. at 151.  Petitioner later raised this claim on direct appeal

(ground 3) and set forth the purported violations of federal law.

The appellate court *per curiam* affirmed the trial court's decision.

Thus, Petitioner exhausted this claim.

        The Fifth Amendment of the United States Constitution provides

that "[n]o person . . . shall be compelled in any criminal case to

be a witness against himself."  U.S. Const. Amend. V.  The United

States Supreme Court in Miranda v. Arizona considered the scope of

this  Fifth  Amendment  guarantee  against  self  incrimination.

Miranda, 384 U.S. 436 (1966).  In Miranda, the Court held that

before a suspect, in custody, can be interrogated, the suspect must

be informed of his right to remain silent, that what he says can be

used  against  him,  and  the  right  to  have  an  attorney  during

interrogation, or if he cannot afford an attorney, the right to

have one appointed.   Id. at 478-479.  It is clearly established

federal law that a state cannot introduce a suspect's testimony

provided in the absence of an attorney without first showing that

the suspect made a voluntary, knowing, and intelligent waiver of

his _Miranda_ rights.  _Hart v. Attorney General for Fla._, 323 F.3d 884, 891 (11th Cir. 2003).  A two-prong test is required to determine whether a waiver was voluntary, knowing, and intelligent:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court conclude that the _Miranda_ rights have been waived.

_Moran v. Burbine_, 465 U.S. 412, 421 (1986)(quoting _Fare v. Michael C._, 442 U.S. 707, 725 (1979)).  Courts look at four factors, none of which are independently dispositive, to determine whether a statement is voluntary: (1) whether the _Miranda_ warning was given; (2) "'[t]he temporal proximity of the arrest and the confession'"; (3)"'the presence of intervening factors'";(4) "'the purpose and flagrancy of the official misconduct.'" _Lawhorn v. Allen_, 519 F.3d 1272, 1291 (11th Cir. Mar. 11, 2008).

To determine "knowing" and "intelligent" waiver of _Miranda_ rights, the courts focus on the suspects' comprehension of their rights.  _Blanco v. Singletary_, 943 F.2d 1477, 1509-1510 (11th Cir. 1991)(citing _Mincey v. Arizona_, 437 U.S. 385 (1978)).  "'If a defendant cannot understand the nature of his rights, he cannot waive them intelligently.'" _Miller v. Dugger_, 838 F.2d 1530, 1539 (11th Cir. 1988).  If a defendant umambigously requests for counsel

or to remain silent, police must cease interrogation.  <u>Berghuis</u>,
130 S. Ct. at 2259-61; <u>Davis v. United States</u>, 512 U.S. 452, 459
(1994)(concluding if an accused makes a statement concerning the
right to counsel "that is ambiguous or equivocal" or makes no
statement, then police are not required to end the interrogation).

During the hearing on the motion to suppress, the court heard
testimony from officers, including, Agents Jones, Sergeant Kamp,
and officer Ferrante.  Exh. 13 Vol. 2 at 188. Petitioner Mycoff
also testified during the hearing.  The officers testified that
Petitioner was read his <u>Miranda</u> rights on September 7.  <u>See</u> Exh.
13, Vol. 2 at 187-255 (transcript of suppression hearing and
parties' supporting memoranda).  Petitioner signed the waiver form,
indicating that he was freely, voluntarily, and intelligently
waiving his rights.  <u>Id.</u>; <u>see also</u> Exh. 13, Vol. 6 at 378-380
(portion of trial transcript showing that Petitioner voluntarily,
knowingly, and intelligently waived his <u>Miranda</u> rights and executed
a waiver form).  The record shows that during the officers'
questioning on September 7, when Petitioner made a comment about an
attorney, the questioning ceased.  When Petitioner gave officers
additional statements about the case on September 9 and 10, the
record supports the trial court's finding that either Petitioner
initiated the discussion, and/or there was no <u>Miranda</u> violation
because Petitioner waived his <u>Miranda</u> rights.  Therefore, the trial

court's denial of defense counsel's motion to suppress is supported by the record.

Based upon a review of the record and considering the totality of the circumstances, the Court finds Ground Five is without merit. Here, the trial court's decision was neither contrary to, nor involved an unreasonable application of clearly established federal law. Further, the trial court did not apply an unreasonable determination of facts in light of the evidence presented in the State court proceeding. Based on the foregoing, the Court denies relief as to Ground Five on the merits.

### Ground 6: Double Jeopardy Issue

Petitioner argues that his conviction violates the Double Jeopardy Clause because he was convicted of two counts of manslaughter when there was only one victim. Petition at 34.

In Response, Respondent points out that at sentencing the trial court merged the two manslaughter counts and he was only sentenced on one count. Response at 18; Exh. 13, Vol. 4 at 388-395. Respondent submits that "[t]here is nothing improper in sending a case to the jury on alternate theories of felony murder and premeditated murder." Response at 18. Respondent further states "[t]he State only runs afoul of double jeopardy if, after the verdict, he is sentenced on both even though only one victim was involved." Id.

Petitioner raised this claim in his first Rule 3.850 Motion (as ground A). Petitioner argued that the conviction and sentence violated the Double Jeopardy Clauses of the Florida Constitution and the United States Constitution.[22] Exh. 14, Vol. 1 at 100.

The post-conviction court denied Petitioner relief and ruled as follows:

> [T]he record conclusively establishes that, although verdicts were returned for two counts of manslaughter involving the same individual, the counts were merged at sentencing and Defendant was only sentenced on count I. See copies of verdict form, the transcript from the June 1, 1999 sentencing hearing, the court minute sheet, the Judgment and Sentence form, and Sentencing Guidelines Scoresheet. Accordingly, the court finds that Issue A is without merit and denied.

Exh. 14, Vol. 1 at 109-10. Petitioner appealed, but the appellate court *per curiam* affirmed. Petition at 4; Mycoff v. State, 853 So. 2d 420 (Fla. 2d DCA 2003).

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides in relevant part "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. The Double Jeopardy Clause protects defendants in three situations: (1) a prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple

_____

[22] To the extent Petitioner raised Ground Six in his Rule 3.850 Motion and appealed the adverse result therefrom, the Court finds Petitioner has exhausted Ground Six.

punishments for the same offense.  Jones v. Thomas, 491 U.S. 376, 380-81 (1989).

Here, Petitioner asserts a Double Jeopardy violation, presumably, for multiple punishments for the murder of one victim. Petition at 34;  Reply at 34. The record conclusively shows, however, that although the jury returned a guilty verdict for two counts of manslaughter, at sentencing the counts were merged and Petitioner was only sentenced for one count of manslaughter. Therefore, the post-conviction court's decision was neither contrary to, nor involved an unreasonable application of clearly established federal law.  Further, the post-conviction court did not apply an unreasonable determination of facts in light of the evidence presented in the State court proceeding.  Petitioner is denied relief on Ground Six.

### Ground 7: Newly Discovered Evidence Claim- Juror Issue

Petitioner claims his conviction is unconstitutional based on his discovery of newly discovered evidence concerning a "biased" juror that tainted the jury. Petition at 35.  Specifically, Petitioner claims that juror Jill Draper, also known as "Karen," was the managing bartender at a local tavern where Petitioner and some of the State's witnesses use to frequent.  Id. at 35, 36. Petitioner claims Ms. Draper "eject[ed] [sic] [Petitioner] from the tavern on several occasions for rowdiness and fighting, and had

stated to others <u>prior</u> to trial that she did not like [Petitioner] Mycoff." <u>Id.</u> (emphasis in original).

In Response, Respondent submits that a claim of newly discovered evidence is not a cognizable claim for federal habeas corpus relief. Response at 19 (citing <u>Fuster-Escalona v. Florida Dep't of Corr.</u>, 170 F. App'x 627, 630 (11th Cir. 2006). Respondent further argues that Petitioner's argument in this ground is based on "mere speculation" and points out that even Petitioner failed to recognize this juror, who supposedly threw him out of a bar on multiple occasions, during trial. Response at 20. Additionally, Respondent notes that the name of the alleged bartender juror, "Karen," does not appear on the jury list. <u>Id.</u>

## A.  Exhausted and Procedural Default

Based on a review of the record and binding precedent, the Court finds this claim is unexhausted and procedurally defaulted. Petitioner raised a similar claim in his initial Rule 3.850 Motion (as ground H). The post-conviction court denied Petitioner relief, finding as follows:

> Defendant alleges in **Issue H** that a "prospective juror withheld . . . material information, bearing on her possible bias and qualification to serve" and that this [prospective juror] "withheld information entered into the jury room, possibly shared with others jurors, and inflamed, impassioned, and prejudiced [the] jury in rendering the verdicts." The court notes that Defendant does not identify the juror at issue, nor does he claim that the person was an actual member of the jury (referring to her only as a "prospective juror"). Furthermore, Defendant's claim that the unnamed prospective juror "possibly" shared inflammatory,

prejudicial information with other members of the jury is
        purely speculative.  Finally, based on Defendant's
        claims, it appears that the alleged misconduct is
        information contained in the original record of the case
        or is information that was known to Defendant at the time
        the jury was selected.  Regardless, the court finds that
        issue H is denied as procedurally-barred because it could
        have and should have been raised on direct appeal.
        <u>See</u> <u>Lambrix v. State</u>, 559 So. 2d 1137.

Exh. 14, Vol. 1 at 112-13 (emphasis in original).  Petitioner

appealed, and the appellate court *per curiam* affirmed.  <u>Mycoff v.</u>

<u>State</u>, 853 So. 2d 420 (Fla. 2d DCA 2003).

     Significantly, Petitioner did not raise the same claim *sub*

*judice* as he raised in his initial Rule 3.850 Motion.  Before the

post-conviction court, Petitioner referred to the juror as a

"prospective" juror, not a juror who was actually selected to serve

on his juror.  <u>See</u> <u>Id.</u>; <u>see</u> <u>also</u> Exh. 14, Vol. 1 at 103 (setting

forth Ground H (Rule 3.850 Motion)).  Petitioner also could not

identify the juror by name.  <u>Id.</u>  In the instant Petition,

Petitioner now refers to the juror as a "juror," not a

"prospective" juror.  Petitioner also refers to the juror by either

the name, "Karen," or "Jill Draper," when the name Karen does not

appear on the list of jurors, but Jill Draper does appear on the

list.  Petition at 35; Response at 20.

     Nevertheless, the Court finds Ground Seven is unexhausted and

procedurally-barred because Petitioner failed to raise the claim he

raises *sub judice*, or the claim he raised in his Rule 3.850 Motion,

on direct appeal.  As correctly noted by the post-conviction court,

under Florida law this claim is procedurally-barred because Petitioner could have and should have raised it on direct appeal. See <u>Lambrix</u>, 559 So. 2d 1137 (Fla. 1990)(claim of jury misconduct based on information that was contained in the original record must be raised on direct appeal).

To the extent Petitioner now attempts to frame this claim as based on "newly discovered evidence," whether the claim qualified as newly discovered evidence is a matter of State law. In Florida, to qualify as "newly discovered evidence," the evidence must consist of facts that were unknown at the time of trial, and it must appear that the defendant or defense counsel could not have known those facts even if they had used due diligence. <u>Jones v. State</u>, 591 So. 2d 911, 916 (Fla. 1991). Significantly, Petitioner failed to alert the post-conviction court to the fact that he was supposedly unable to discover these facts until after direct appeal was completed. Petitioner certainly did not mention the phrase "newly discovered evidence" in his Rule 3.850 Motion. Moreover, the question whether Petitioner's instant claim constitutes newly discovered evidence does not present a cognizable federal habeas corpus claim, absent some other federal constitutional violation. Therefore, the Court will deny Petitioner relief on Ground 7 as unexhausted and procedurally-defaulted.

**B.  Merits**

Even if Ground 7 was not procedurally defaulted and a proper issue for the federal court's review, the merits of Petitioner's claim do not warrant relief.  The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors.  Irvin v. Dowd, 366 U.S. 717, 722 (1961). Qualified jurors need not, however, be totally ignorant of the facts and issues involved.  Murphy v. Florida, 421 U.S. 794, 795 (1975).  In Irvin, the Supreme Court noted:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside [her] impression or opinion and render a verdict based on the evidence presented in court.

Id. at 723.  Indeed, extrinsic evidence that has not been subject to procedural safeguards of a fair trial threatens the constitutional safeguards, such as, the defendant's right of confrontation, of cross-examination, and of right to counsel. Turner v. Louisiana, 379 U.S. 466, 472 (1965).

Significantly, as set forth in Petitioner's Rule 3.850 Motion, Petitioner did not identify the juror as someone who in fact served on his jury, nor could he identify the juror by name.  Petitioner only identified the juror as a "prospective juror."  Even assuming that this juror, who either goes by the name "Jill" or "Karen," had in fact worked at a bar where Petitioner went on previous

occasions, as raised for the first time in the instant Petition, these facts do not show that the juror was actually biased. <u>Smith v. Phillips</u>, 455 U.S. 209, 216 (1982)(a petitioner claiming juror impartiality must show actual bias). Petitioner's contentions that the juror could have inflamed the juror are merely speculative. The trial court's standard instructions inform jurors not to form any fixed opinions on the case until all the evidence is heard and to base the verdict solely on the evidence, or lack of evidence, and the law on which they will be instructed. <u>Smith</u>, 455 U.S. at 217 (stating "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."). There is no reason to believe that the jurors did not follow these instructions. Petitioner has not shown that the post-conviction court's decision was neither contrary to, nor involved an unreasonable application of clearly established federal law. Further, Petitioner has not shown that the post-conviction court did not apply an unreasonable determination of facts in light of the evidence presented in the State court proceeding. Therefore, Petitioner is denied relief on the merits of Ground Seven.

## Ground 8: Newly Discovered Evidence- Petitioner is Actually Innocent

Petitioner claims that he is entitled to habeas corpus relief because he is "actually innocent." Petition at 38. Specifically,

Petitioner alleges that it was Jeff Charron who killed Patricia Northrup. Id. Petitioner claims the following facts support his claim:

> (1) Around August 28, 2001, state [sic] witness [,] Jeffrey Charron [,] called Patricia Battaglia and threatened to beat her and all her family with a baseball bat like Charron did to Patricia Northrup . . . if Ms. Battaglia's husband, Joe, did not "stop his [expletive]";
>
> (2) That Joe Battaglia went to monthly pharmacy meetings with Jeff Charron throughout 1997-2002 where Charron would constantly "pop pills" and abuse alcohol;
>
> (3) Around 2001, Charron complained to Battaglia that Charron was having "flashbacks" about blood spattering from Patricia Northrup's head when struck with a baseball bat, and asked Battaglia for sleeping pills.

Id. Petitioner claims no reasonable juror would have convicted him of manslaughter and robbery if this evidence would have been presented at trial. Id.

In Response, Respondent points out that the State court held an evidentiary hearing on this claim. Response at 20. After holding an evidentiary hearing, the post-conviction court denied Petitioner relief. Id. Respondent cites the post-conviction court's order of denial, verbatim, and submits that Petitioner's claim does not raise a cognizable federal claim for relief, nor does he show that he is actually innocent. Id. at 20-27.

Petitioner raised this claim in his second Rule 3.850 Motion. Exh. 14, Vol. 1 at 12-21. On August 24, 2004, the post-conviction court held an evidentiary hearing. Exh. 14, Vol. 8 at 1373-1419. After holding the hearing, the court directed supplemental briefing

from the parties, and denied Petitioner relief.  Exh. 14, Vol. 8 at

1331; 1458-1464.  The appellate court *per curiam* affirmed.  Exh. 7.

The post-conviction court denied Petitioner relief and found

as follows:

> Grounds 1(a), 1(b), and 1(c), all involve claims of
> newly discovered evidence filed pursuant to rule
> 3.850(b)(1).  In determining whether newly discovered
> evidence warrants setting aside a conviction, a trial
> court must first consider whether the newly discovered
> evidence would have been admissible at trial or whether
> there would have been any evidentiary bars to its
> admissibility.  Next, it should evaluate the weight of
> both the newly discovered evidence and the evidence that
> was adduced at trial.  The evaluation of the weight to be
> accorded the newly discovered evidence should include
> whether the evidence goes to the merits of the case or
> whether it constitutes impeachment evidence and whether
> it is cumulative to other evidence presented at trial.
> Jones v. State, 709 So. 2d 513 (Fla. 1998).  Relief is
> appropriate if the trial court determines that the newly
> discovered evidence, in conjunction with the evidence
> introduced at trial, would have probably produced an
> acquittal.  Swafford v. State, 828 So. 2d 966 (Fla.
> 2002).

> According to ground 1(a), Defendant has learned that
> Jeff Charron, a witness who testified against him at
> trial, has drug and alcohol problems.  Pursuant to
> Edwards v. State, the introduction of evidence of a
> witness's drug use for the purpose of impeachment will be
> excluded unless: (a) it can be shown that the witness had
> been using drugs at or about the time of the incident
> which is subject of the witness's testimony; (b) it can
> be shown that the witness is using drugs at or about the
> time of testimony itself; or (c) it is expressly shown by
> other relevant evidence that the prior drug use affects
> the witness's ability to observe, remember, and recount.
> 548 So. 2d 656 (Fla. 1989).

> The Court notes that evidence was introduced at
> trial regarding Charron's alcohol use at the time of the
> crime (the incident that was the subject of trial
> testimony).  See attached copy of trial transcript, pages
> 936-949.  Accordingly, such evidence cannot be considered

"newly discovered" for purposes of rule 3.850(b)(1).
Furthermore, Defendant has not alleged and there has been
no evidence to suggest that Charron's prior drug use
affected his ability to observe, remember, or recount.
Notably, defense counsel's written brief states that the
Edwards "exception relevant to this case is when 'it can
be shown that the witness was using drugs at or about the
time of the testimony itself.'"

In support of ground 1(a), a former co-worker of
Charron's, Joseph Battaglia, testified at the evidentiary
hearing regarding Charron's alleged alcohol and drug
problems.  According to Battaglia's testimony, from 1998
through 2002, he would see Charron, a fellow pharmacist,
at monthly educational meetings.  See attached copy of
evidentiary hearing transcript, pages 11-12.  Battaglia
observed Charron ingesting small pills at the meetings
but he did not know what they were.  See attached copy of
evidentiary hearing transcript, pages 11-12.  Notably,
Battaglia appeared to contradict himself on cross-
examination when he stated that he noticed Charron
drinking heavily and taking medication at meetings
starting in 1997.  See attached copy of evidentiary
hearing transcript, page 27.  However, when instructed
to "tell the Judge of your observations of Mr. Charron's
alcohol problem," Battaglia responded "that would have
been between 2000 and 2002."  See attached copy of
evidentiary hearing transcript, page 14.  Finally,
Battaglia testified that he observed Charron taking xanax
with alcohol during monthly meetings between the years
2000 and 2002.  See attached copy of evidentiary hearing
transcript, pages 14-15.  Finally, Battaglia testified
that the dates of the monthly meetings he attended with
Charron "switched" each month and that they did not
always attend the meeting on any given month.  See
attached copy of evidentiary hearing transcript, pages
16, 26.

The Court finds that Defendant has not offered any
evidence to support the conclusion that Charron was under
the influence of drugs or alcohol at or near the time he
testified at Defendant's trial in April 1999.
Battaglia's testimony concerning Charron's drug and
alcohol use referenced a period of years and was
witnessed at monthly meetings held on undetermined dates.
Furthermore, Battaglia did not specify exactly which
monthly meetings he and Charron both attended.  In other
words, Battaglia was not able to narrow down which

months, let alone dates, he observed Charron ingest drugs and/or alcohol. Without any indication that Charron was using drugs or alcohol at or near the time he testified at trial, Battaglia's impeachment testimony would have been excluded in accordance with Edwards v. State, 548 So. 2d 656. Upon consideration, the Court finds that it is highly unlikely that Battaglia's testimony, in conjunction with the evidence introduced at trial, would have produced an acquittal. Swafford v. State, 828 So. 2d 966 (Fla. 2002). Therefore, ground (1)(a) is denied.

Defendant alleges in ground (1)(b) that Joseph Battaglia, one of Charron's former co-workers, has heard Charron admit that he has flashbacks of a girl he murdered. In support of his claim, Defendant submitted a letter written by Joseph Battaglia on December 4, 2002 stating that he has heard Charron say "that he has vivid flashbacks of a girl he [Charron] murdered." Notably, the letter did not state that Charron identified the girl by name.

According to Mr. Battaglia's evidentiary hearing testimony, he would often see Charron as monthly educational meetings attended by local pharmacists. Alcohol and food was served at this meetings. At one such meeting held in 2002, Charron asked Battaglia to recommend some sleeping pills for him. When asked why he was having trouble sleeping, Charron answered that he "kept having nightmares or flashbacks of a Patricia Northrup . . . being struck over the heard [sic]. [Charron] didn't say he was striking her over the head, but being struck over the head and blood splattering away from the body." See attached copy of evidentiary hearing transcript, pages 16-17.

However, on cross-examination, the prosecutor asked Mr. Battaglia why his December 4, 2002 letter referenced a "girl" whereas his direct testimony indicated that Charron specifically identified the victim by name. Battaglia answered, "[w]ell, the girl he was referring to was Patricia Northrup." See attached copy of evidentiary hearing transcript, page 31. The prosecutor further clarified Battaglia's testimony by asking, "[y]our testimony today is that Charron talked to you about having trouble sleeping because of dreams or flashbacks?" Battaglia answered "[t]hat's correct." The prosecutor continued, "[a]bout a girl's head being hit and blood being splattered?" Battaglia answered "[y]es, ma'am."

See attached copy of evidentiary hearing transcript, page 35.

The Court notes that Mr. Battaglia's sworn evidentiary hearing testimony differed from his letter in another important respect. Battaglia wrote in his letter that he heard Charron admit to murdering a girl. Whereas at the evidentiary hearing, Battaglia affirmatively testified under oath that Charron did not admit to murdering a girl or even hitting a girl over the head. Rather, Charron admitted to having flashbacks or nightmares of a girl being hit over the head. See attached copy of evidentiary hearing transcript, pages 16-17. In light of the fact that (a) Charron's statements to Battaglia constitute extremely weak impeachment evidence because they are not tantamount to a confession; (b) the original defense at trial was that Charron killed the victim (see attached copy of trial transcript, pages 946-47); and (c) the jury rejected that defense, the Court finds that Mr. Battaglia's testimony is not likely to produce an acquittal on retrial. Accordingly, ground 1(b) is denied.

Defendant alleges in ground 1(e) that since his conviction, prosecution witness Jeff Charron confessed to Patricia Battaglia that he killed the victim. Specifically, Defendant claims that Charron telephoned Mrs. Battaglia, the wife of one of his former co-workers, and threatened "to beat her and the Battaglia children with a bat." In support of his claim, Defendant had submitted a notarized letter written by Mrs. Battaglia stating that on August 28, 2001, Charron telephoned her and said that her husband, Joseph Battaglia, "had better stop . . . or all [of the Battaglia family] would see first hand what a . . . bat can do."

According to Mrs. Battaglia's evidentiary hearing testimony, her husband and Charron were involved in an on-going work-related dispute. On August 28, 2001, Charron telephoned Mrs. Battaglia and told her that her husband had better stop or "we– and I took it as me and the kids or the family– are going to get the same that he did to the girl." Mrs. Battaglia was again asked to "tell the Judge about the . . . specific conversation Jeff Charron had with you." She answered, "He called and he told me, he said, Joey better stop . . . or his family is going to get the bat like the girl. Something within that line." When asked on cross-examination whether her

September 12, 2002 letter included everything about Charron's phone call that she could remember, Mrs. Battaglia answered "I remembered as much as I could." See attached copy of evidentiary hearing transcript, pages 5-8.

The Court notes that Mrs. Battaglia's September 12, 2002 letter makes no reference to "a girl" and it does not state that Charron admitted to ever having hit someone with a bat. Mrs. Battaglia testified at the evidentiary hearing that she remembered as much as she could when she wrote her letter. Yet, her testimony concerning Charron's alleged threat is inconsistent with the letter. She initially testified that Charron threatened that her family would "get the same that he did to the girl." However, she later changed her testimony to state that Charron said that her family was "going to get the bat like the girl." Notably, Mrs. Battaglia then qualified her testimony by adding that Charron's statement was "something within that line." In conclusion, it appears to the Court that Mrs. Battaglia does not have a clear recollection of Charron's statement such as would allow her to unequivocally testify that he admitted to having ever hit someone with a bat. In light of the fact that (a) Mrs. Battaglia could not conclusively recall whether Charron confessed; (b) the original defense at trial was that Charron killed the victim (see attached copy of trial transcript, pages 947-956); and (c) the jury rejected this defense, the Court finds that Mrs. Battaglia's testimony is not likely to produce an acquittal on retrial. Accordingly, ground 1(e) is denied.

Exh. 14, Vol. 8 at 1458-1464.

"To successfully plead actual innocence, a petitioner must show that his conviction resulted from 'a constitutional violation.'" Johnson v. Fla. Dep't of Corr., 513 F.3d 1328, 1334 (11th Cir. 2008)(quoting Schlup, 513 U.S. at 327). The actual innocence claim in Schlup is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass

to have his otherwise [procedurally] barred constitutional claim considered on the merits." Schlup, 513 U.S. at 315 (quotation marks omitted).

To be credible, a claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence– whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence– that was not presented at trial." Id. at 324. Therefore, Petitioner "must demonstrate that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," and "must raise sufficient doubt about this guilt to undermine confidence in the result of the trial." Johnson, 513 F.3d at 1334 (quotation marks and alteration omitted). The federal courts have recognized that "actual innocence" means "factual innocence, not more legal insufficiency." Id. (quotation marks and alteration omitted).

Petitioner raises this claim as a separate basis for relief and does not raise an independent constitutional violation, contrary to Schlup. See Herrera v. Collins, 506 U.S. 390, 400 (1993). Therefore, this claim does not warrant federal habeas relief. Even if Petitioner did state a viable claim for relief, the facts elicited from the State court's evidentiary hearing shows that any reasonable jury could have convicted Petitioner. The facts relied upon by the post-conviction court support that Charron

did not have a drug or alcohol problem at the time of trial. To the extent Charron was drinking alcohol when the victim was murdered, the jury heard such testimony. Significantly and contrary to Petitioner's allegations, the testimony during the evidentiary hearing established that Charron <u>never</u> confessed to the Battaglias that he killed Patricia Northrup. Moreover, as the post-conviction court found, the Battaglias' statement regarding Charron having "flashbacks" is consistent with Charron's statement during trial that he witnessed Petitioner take the first swing at the victim with the bat before he retreated into his house. Vol. 5 at 127. Petitioner has not shown that the post-conviction court's decision was neither contrary to, nor involved an unreasonable application of clearly established federal law. Further, Petitioner has not shown that the post-conviction court did not apply an unreasonable determination of facts in light of the evidence presented in the State court proceeding. Therefore, Petitioner is denied relief on Ground Eight.

**Ground 9: Trial court erred- Sentencing Issue**

Petitioner claims that the trial court erred by not using the proper "sentencing procedure." Petition at 39. Petitioner alleges that the sentencing procedure utilized was in error and not in accordance Fla. Stat. § 775.084 (5), thereby violating his due process rights under the Fourteenth Amendment of the United States

Constitution.[23]    Petition at 39.    Specifically, Petitioner claims that the trial court did not make factual findings "as to the case numbers supplied by the State through the testimony [sic] of Linda Crosby finger print examiner over defences [sic] objection as not being licensed and therefore not qualified.  Had the Judge done so he would have descovered [sic] that the Stat [sic] attorney had not supplied the required non sequential conviction[s]."    Id. Petitioner appears to take issue with the list of case numbers presented at sentencing and claims the trial court did not make the requisite "factual finding."    Id.

Respondent submits that the record refutes Petitioner's claim that the trial court did not make factual findings consistent with Fla. Stat. § § 775.084 (5).  Response at 27.  Respondent points out that the trial court relied upon the pre-sentence investigation report ("PSI report") admitted into evidence.    The PSI report revealed the Petitioner had two prior felony convictions within five years and thereby found that Petitioner qualified as a habitual felony offender.    Id.    Respondent also notes that Petitioner raised this claim in his Rule 3.800(a) Motion and the post-conviction court denied him relief.    Id. (citing Exh. 16).

---

[23]The Court notes that the scanned copy of the Petition on the Court's electronic case management system is not legible.  The actual copy of the Petition is legible and is written in pencil.

## A. Exhaustion and Procedural Default

Petitioner raised a sentencing error claim in his Rule 3.800(a) Motion and set forth the claim as a violation of his Fourteenth Amendment rights and <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000). Exh. 14, Vol. 2 at 83-94. The post-conviction court denied Petitioner relief on November 29, 2000. Exh. 14, Vol. 2 at 95-97. Petitioner appealed the adverse decision, and the appellate court *per curiam* affirmed. Petitioner also raised a claim concerning the sentencing procedure in his second Rule 3.800(a) Motion. Petition at 16 (copy of order denying second Rule 3.800(a) Motion). The claim raised in Petitioner's second Rule 3.800(a) Motion is more similar to the instant claim, than the claim raised in his first 3.800 Motion.[24] There Petitioner argued that the State failed to prove two separate felony conviction as required by Fla. Stat. § 775.084(5). The post-conviction court denied Petitioner relief. Petition at 16-17. Therefore, the Court finds Ground 9 is exhausted.

---

[24]The Court cannot locate a copy of Petitioner's Second Rule 3.800(a) Motion to determine whether he raised the claim below in terms of a federal violation. Neither the Petition, nor Respondent's exhibits appear to contain a copy of the motion. The post-conviction order denying Petitioner relief on his second Rule 3.800 Motion does not mention that Petitioner raised a due process issue. Petition at 16-17. Nevertheless, the Court will treat Ground 9 as exhausted to the extent Petitioner raised a federal due process violation in his first Rule 3.800 Motion.

## B.  Merits

The post-conviction court denied Petitioner relief on his first Rule 3.800(a) claim raising an <u>Apprendi</u> and Fourteenth Amendment claim, finding as follows:

> [] The State filed a Habitual Felony Offender Notice on April 28, 1999.  On June 1, 1999, Defendant was sentenced as a habitual felony offender to 30 years state prison.
>
> Defendant's conviction and sentence was affirmed, per curiam, by the second District Court of Appeal on July 28, 2000.  <u>Mycoff v. State</u>, 768 So. 2d 456 (table).
>
> In his Rule 3.800(a) motion [,] Defendant argues that any sentence enhanced pursuant to the habitual offender statute, Florida Statue Section 775.084, is illegal because the statute is unconstitutional "applied or on its face."  Defendant further argues that the information in his case did not charge and the jury did not find beyond a reasonable doubt the facts required to prove that he was an [sic] habitual felony offender and to support enhancement pursuant to Florida Statute Section 775.084.  In support of his argument, Defendant cites to United States Supreme Court case <u>Apprendi v. New Jersey</u>, 120 S. Ct. 2348 (June 26, 2000).
>
> <u>Apprendi</u> involved New Jersey's hate crime enhancement statute which, for sentencing purposes, allowed the trial judge to make a factual finding, by a preponderance of the evidence, as to whether the defendant possessed, at the time he committed the subject act, a purpose to intimidate on account of, inter alia, race.  In rejecting the New Jersey statute, the United States Supreme Court found that it required an examination of the defendant's state of mind and, as such, "is perhaps as close as one might hope to come to a core criminal offense 'element.'" <u>Id.</u> at 2364.  Such a factual determination as to what is essentially an element of a criminal offense, and which could increase the penalty beyond the statutory maximum, is one which should be submitted to a jury and proven beyond a reasonable doubt.

In contrast, Florida's habitual offender statute is based upon prior convictions or recidivism, and is completely unrelated to defendant's state of mind or to any element of the subject offense. This distinction was expressly recognized by the United States Supreme Court in <u>Apprendi</u>:

> "*Other than the fact of a prior conviction*, any fact which increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable double." (emphasis added). 120 S. Ct. at 2362, 2363.

The United States Supreme Court further explained as follows:

> "Whereas recidivism 'does not relate to the commission of the offense itself, 523 U.S. at 230, 244, 118 S. Ct. 1219, New Jersey's biased purpose inquiry goes precisely to what happened in the 'commission of the offense.' Moreover, there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof." <u>Id.</u> at 2366.

Moreover, the Florida Supreme Court has expressly upheld the constitutionality of the habitual offender statute. <u>Heath v. State</u>, 648 So. 2d 660 (Fla. 1994); <u>Seabrook v. State</u>, 629 So. 2d 129 (Fla. 1999); <u>Merriweather v. State</u>, 609 So. 2d 1299 (Fla. 1992).

Exh. 14, Vol 2 at 96-97.

In addressing the second Rule 3.800(a) Motion, the post-conviction court denied Petitioner relief, finding in relevant part as follows:

> § 775.084(5) states, "[i]n order to be counted as a prior felony for purposes of sentencing under this section, the felony must have resulted in a conviction

sentenced separately prior to the current offense and
sentenced separately from any other felony conviction
that is to be counted as a felony."

The record reflects that the prior convictions the State
relied on at the habitualization hearing included Lee
County Circuit Court Case Numbers 89CF906, 92CF344,
93CF973, 93CF974 and 93CF1283 and DeSoto County Circuit
Court Case Numbers 95CF85. See attached copy of Record of
Exhibits Received. In Case Number 89CF906, Defendant was
convicted and sentenced on January 3, 1990 for burglary
and grand theft, both third-degree felonies. In Case
Number 92CF344, Defendant was convicted and sentenced on
September 23, 1993 for possession of a firearm by a
convicted felon, a second-degree felony. In Case Number
93CF973, Defendant was convicted and sentenced on
September 23, 1993 for grand theft, a third-degree
felony. In Case Number 93CF974, Defendant was convicted
and sentenced on September 23, 1993 for possession of
alligator, a third-degree felony. In Case Number
93CF1283, Defendant was convicted and sentenced on
September 23, 1993 for grand theft, a third-degree
felony. In Case Number 95CF85, Defendant was convicted
and sentenced on June 16, 1995 to possession of a firearm
by a convicted felon, a third-degree felony. See
attached copies of Judgment and Sentence forms.
Accordingly, the record reflects that the prior felony
convictions relied on by the State for habitualization
purposes met the requirements of Florida Statute §
775.084(5).

Petition at 16-17.

To the extent Petitioner is alleging the trial court's
sentencing hearing violated Fla. Stat. § 775.084(5), such a claim
reviewing a finding of state law is not cognizable in a federal
habeas proceeding. Engle v. Isaac, 456 U.S. 107, 119-20 (1982);
Davis v. Jones, 506 F.3d 1325, 1332 (11th Cir. 2007)("A state's
interpretation of its own laws or rules provides no basis for
federal habeas corpus relief, since no question of a constitutional
nature is involved."). Davis, 506 F.3d at 1332 (internal

quotations and citations omitted). Claims which do not raise a federal question are not subject to review because this Court may not inquire into the validity of the trial court's application of its state law. Carrizales v. Wainwright, 699 F.2d at 1055; Cabberiza v. Moore, 217 F.3d 1329 at 1333. See also Branan v. Booth, 861 F.2d 1507, 1508 (11th Cir. 1988). This is particularly true in the sentencing realm. As reaffirmed by the Eleventh Circuit,

> [i]n the area of state sentencing guidelines in particular, we consistently have held that federal courts can not review a state's alleged failure to adhere to its own sentencing procedures.

Brannon v. Booth, 861 F.2d 1507, 1508 (11th Cir. 1988)(citing cases omitted).

To the extent Petitioner raises a due process claim under the Fourteenth Amendment based on his sentencing hearing, the record shows that Petitioner was alerted to the fact that the State was seeking sentencing against Petitioner as a habitual felony offender on April 28, 1999, when the State filed a Habitual Felony Offender Notice. The trial court made the requisite finding required under Fla. Stat. § 775.084 that Petitioner had been convicted of at least two prior felonies during the five years proceeding trial, as introduced by the pre-sentence investigation report. See Petition at 16-17. In this circumstance, the Court cannot conceive of any meritorious Fourteenth Amendment violation. Petitioner has not shown that the post-conviction courts' decisions were neither

contrary to, nor involved an unreasonable application of clearly established federal law. Further, Petitioner has not shown that the post-conviction courts applied an unreasonable determination of facts in light of the evidence presented in the State court proceedings.  Therefore, Petitioner is denied relief on Ground 9.

ACCORDINGLY, it is hereby

**ORDERED:**

1.  The Petition for Writ of Habeas Corpus (Doc. #1) is **DENIED** with prejudice for the reasons set forth herein.

2.  The Clerk of Court shall enter judgment accordingly, terminate any pending motions, and close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL *IN FORMA PAUPERIS* DENIED

**IT IS FURTHER ORDERED** that Petitioner is not entitled to a certificate of appealability.  A prisoner seeking to appeal a district court's final order denying his petition writ of habeas has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1); Harbison v. Bell, ___ U.S. ___, 129 Ct. 1481, 1485 (2009).  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542

U.S. 274, 282 (2004) or, that "the issues presented were adequate to deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Fort Myers, Florida, on this __21st__ day of September, 2011.

_John E. Steele_
JOHN E. STEELE
United States District Judge

SA: alj
Copies: All Parties of Record